**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MARILYN RICHARDSON, | : | CIVIL ACTION NO. 06-3934 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| GORDON A. ULSH, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

**COOPER, District Judge**

Plaintiff, Marilyn Richardson ("Plaintiff"), commenced this
shareholder derivative action against (1) defendants Gordon A.
Ulsh ("Ulsh"), Craig H. Mulhauser ("Mulhauser"), J. Timothy
Gargaro ("Gargaro"), Ian J. Harvie ("Harvie"), John P. Reilly
("Reilly"), Michael R. D'Appolonia ("D'Appolonia"), Phillip M.
Martineau ("Martineau"), Michael P. Ressner ("Ressner"), Marc C.
Demetree ("Demetree"), Jerome B. York ("York"), Eugene I. Davis
("Davis"), and Scott McCarty ("McCarty") (collectively, the
"Individual Defendants"), and (2) nominal defendant Exide
Technologies ("Exide").  (Compl.)  Plaintiff alleges, <u>inter alia</u>,
that the Individual Defendants (1) breached their fiduciary
duties of care, loyalty, reasonable inquiry, oversight, good
faith, and supervision to Exide, (2) engaged in misconduct
constituting an abuse of their ability to control and influence
Exide, (3) grossly mismanaged Exide, (4) caused Exide to waste
valuable corporate assets, and (5) were unjustly enriched by

their wrongful actions at the expense of Exide.  (Id.)  The
Individual Defendants move to dismiss the complaint insofar as
asserted against them pursuant to Federal Rule of Civil Procedure
("Rule") 12(b)(6).  (Dkt. entry no. 13.)  Exide also moves to
dismiss the complaint insofar as asserted against it.  (Dkt.
entry no. 14.)  For the reasons stated herein, the Court will
grant the motions.

### BACKGROUND

**I.  Overview**

Exide is "one of the world's largest manufacturers of
batteries, used in network-power, motive power, transportation
and military applications."  (Pl. First Br., at 2.)[1]  On the date
Plaintiff commenced this action, Ulsh was President, Chief
Executive Officer ("CEO"), and a director of Exide.  (Compl., at
¶ 16.)  However, Mulhauser was Exide's President and CEO during
its emergence from chapter 11 bankruptcy and until April 2005.
(Id. at ¶ 17.)  Harvie served as Exide's Vice President and
Corporate Controller at times relevant to the complaint.  (Id. at
¶ 19.)  Gargaro served as Exide's Chief Financial Officer and
Executive Vice President "during all relevant times before and

---

[1] Plaintiff filed separate briefs in opposition to the
Individual Defendants' motion and Exide's motion.  To avoid
confusion, we will refer to Plaintiff's brief in opposition to
Exide's motion (dkt. entry no. 38) as "Pl. First Br." and
Plaintiff's brief in opposition to the Individual Defendants'
motion (dkt. entry no. 39) as "Pl. Second Br."

2

until the end of December 2005." (Id. at ¶ 18.)  Moreover, at
times relevant to the complaint, Reilly was Chairman of Exide's
board of directors, and D'Appolonia, Martineau, Ressner,
Demetree, York, Davis, and McCarty were Exide directors.  (Id. at
¶¶ 20-27.)  Plaintiff alleges that because they held these
positions, each of the Individual Defendants "knew the adverse,
non-public information about the business of Exide, as well as
its finances, markets, business prospects and inability to comply
with several financial covenants".  (Id. at ¶¶ 16-27.)

Exide emerged from chapter 11 bankruptcy on May 5, 2004.
(Id. at ¶ 4.)  That same day, Exide entered into a $600 million
senior secured credit agreement, which it described in its 2005
annual report as its "most important source of liquidity outside
of its cash flows from operations."  (Id. at ¶ 5.)  However,
Exide later negotiated a $365 million senior secured credit
facility, which required it to comply with certain financial
covenants, including a leverage ratio covenant and an EBITDA
covenant.  (Id.; Individual Defs. Br., at 3.)[2]  Plaintiff notes
that the Individual Defendants repeatedly represented that Exide
could maintain compliance with these financial covenants.
(Compl., at ¶ 6.)  Plaintiff asserts, however, that the

---

[2] A leverage ratio covenant requires a company to maintain a
specified ratio of debt to equity.  An EBITDA covenant requires
the company to maintain minimum consolidated earnings before
interest, taxes, depreciation, and amortization.

Individual Defendants consciously disregarded (1) Exide's failure to meet sales forecasts as indicated in the "Weekly Report", (2) flawed sales forecasts in making inventory and manufacturing decisions, (3) internal-control problems that were negatively impacting Exide's contracts with certain of its major customers and causing customer complaints, late deliveries, late or forgotten billings, and obvious excess inventory, and (4) advice from an outside consultant that excess and obsolete inventory needed to be written off sooner.  (Pl. First Br., at 3.) According to Plaintiff, the Individual Defendants' failure to account for these known risks caused Exide to, <u>inter</u> <u>alia</u>, improperly give away free products and large discounts, lose contracts with the United States government and Volkswagen, accumulate millions of dollars of excess and obsolete inventory, overstate its net income, and understate its net losses.  (<u>Id.</u> at 4.)  Thus, Plaintiff alleges that "on the heels of emerging from Chapter 11 Bankruptcy, the Individual Defendants failed to properly address red flags in face [sic] of a known risk."  (<u>Id.</u> at 3.)

## II.  Exide's Alleged Misstatements

Plaintiff contends that between November 2004 and August 18, 2006, the Individual Defendants caused or allowed Exide to disseminate a number of improper statements to the investing public and Exide's shareholders.  (Compl., at ¶¶ 1, 43.)  On

4

November 15, 2004, Exide issued a press release announcing its

financial results for the second quarter of its fiscal year 2005.

(Id. at ¶ 44.)   The press release stated:

> Consolidated net sales for the second quarter of fiscal
> 2005 rose 8.5% to $637.6 million from $587.4 million in
> the second quarter of fiscal 2004. . . .
>
> Consolidated net loss for the second quarter of fiscal
> 2005, including restructuring costs of $4.8 million,
> reorganization costs of $1.7 million and gain on
> revaluation of warrants liability of $12.1 million, was
> $17.1 million, or $0.68 per share, compared to a net
> loss of $15.7 million, or $0.57 per share, in the
> second quarter of fiscal 2004, including restructuring
> costs of $4.8 million and reorganization costs of $15.7
> million.  Net loss as adjusted for these items was
> $22.7 million for the second quarter of fiscal 2005,
> compared to net income as adjusted of $4.8 million for
> the second quarter of fiscal 2004.
>
> Consolidated net sales for the first half of fiscal
> 2005 rose 6.7% to $1.25 billion from $1.17 billion in
> the first half of fiscal 2004.
>
> Consolidated net income for the first half, including
> Fresh Start accounting adjustments, restructuring
> costs, reorganization items, gain on revaluation of
> warrants liability, gain on the discharge of
> liabilities subject to compromise and cumulative effect
> of change in accounting principle was $1.77 billion
> compared to a net loss of $54.3 million in the first
> half of 2004.

(Id. at ¶ 44.)   In the press release, Mulhauser commented:

> Due to the Company's inability to hedge lead prior to
> our emergence from Chapter 11 and despite pricing
> actions and cost reduction initiatives implemented
> during the quarter, we were only able to offset 30-40%
> of the approximately $40 million adverse cost impact
> from lead price increases during the course of the
> quarter.  In the second half, we believe the Company
> will realize additional benefits from the lead hedging,
> pricing actions, restructuring and cost reductions
> implemented in the first half of fiscal year 2005 to

mitigate the impact of higher lead prices.

(<u>Id.</u> at ¶ 45; <u>see</u> Individual Defs. Br., at 4.)

Also on November 15, 2004, Exide filed a Form 10-Q with the
Securities Exchange Commission ("SEC") listing its financial
results for the second quarter of its fiscal year 2005.  (Compl.,
at ¶ 46.)  The Form 10-Q described the same results listed in the
press release.  (<u>Id.</u>)  Also, it explained, <u>inter alia</u>, that:

> [t]he Credit Agreement requires the Company to comply
> with financial covenants with respect to certain ratios
> and tests, as defined in the Credit Agreement,
> including interest coverage, leverage EBITDA[] . . .,
> asset coverage and capital expenditures.  Principally
> as a result of the dramatic increase in lead costs year
> on year and the resultant adverse impact upon the
> Company's results, in November 2004 the Company was
> required to obtain amendments to certain financial
> covenants with respect to EBITDA[] and leverage
> contained in the Credit Agreement. . . .  Although
> there can be no assurances, <u>the Company believes,
> taking into account the November 2004 Credit Agreement
> amendments and based upon its updated financial
> forecasts and plans, that it will comply with these
> covenants for the foreseeable future</u>.

(<u>Id.</u>; <u>see</u> Individual Defs. Br., at 4.)

The Individual Defendants held an earnings conference call
on November 16, 2004 to discuss Exide's second quarter financial
results, in which Gargaro reiterated that "although, there can be
no assurances", Exide's management believed it would comply with
the financial covenants contained its senior credit agreement for
the foreseeable future.  (Compl., at ¶ 47.)  Harvie noted that
Exide's management felt

comfortable with the bank arrangements and the

6

> amendment that's been put in-place.  And the relaxing
> that was done in EBITDA calculation was basically to
> provide [Exide] headroom for the volatility of lead,
> world commodity that isn't controllable by Management
> of the Company, except for our hedging strategies and
> pricing actions which are under our day to day control.

(Id.)  Moreover, with respect to Exide's cost-cutting

initiatives, Mulhauser stated, that the company is "now well

positioned to reap the financial benefits of these pricing

initiatiatives and we expect the impact to be more significant in

our second half."   (Id.)

Exide issued a press release on February 14, 2005 announcing

its financial results for the third quarter of its fiscal year

2005.  (Id. at ¶ 48.)  The press release revealed that Exide had

violated the leverage ratio coverage covenant contained in its

senior credit agreement, but assured investors that "it requested

and expects to receive a waiver of the leverage ratio covenant

from its lenders, as well as amendments relating to the Company's

proposed senior note offering."  (Id.)  Exide reported that:

> Consolidated net sales for the third quarter of fiscal
> 2005 rose 11.5% to $727.9 million from $653.0 million
> in the third quarter of fiscal 2004. . . .
>
> Consolidated net loss for the third quarter of fiscal
> 2005 was $439.0 million, or $17.56 per share, compared
> to a net loss of $9.3 million, or $0.34 per share, in
> the third quarter of fiscal 2004.  The third quarter of
> fiscal 2005 results include a non cash goodwill
> impairment charge of $399.4 million, restructuring
> costs and reorganization items of approximately $8.0
> million and a non-cash income tax charge of $34.5
> million to adjust valuation allowances against
> previously recognized deferred tax assets.  The results
> were favorably offset by a gain on revaluation of

7

Warrants of $5.8 million.

(Id.)  Further, Mulhauser assured the public that Exide was committed to making its customers successful and creating long-term value for its shareholders.  (Id.)  In describing Exide's third quarter of 2005 results, Mulhauser stated:

> [W]e successfully recovered 65-70% of the increased lead costs in the quarter due to pricing actions, lead price escalators, lead hedging and improved spent battery collection rates . . . [and] [t]his is a significant improvement over the second quarter, when we were only able to offset 30-40% of the adverse impact from lead price increases.
>
> The Company will continue its efforts to implement plans and make investments to accelerate cost reductions and increase cash flow from operations.

(Id.)

Exide also held an earnings conference call on February 14, 2005, in which Gargaro made the following statements regarding Exide's financial results for its third quarter of 2005:

> [L]ast quarter we had obtained amendments to certain financial covenants with respect to adjusted EBITDA and leverage contained in our credit agreement.  Based on our adjusted EBITDA performance this quarter, we are in compliance with the covenant.
>
> [P]artially because a large percentage of our debt is Euro denominated, the continued fall of the dollar against the Euro had inflated the value of our debt. So, we did not satisfy our leverage ratio covenant as of December 31, 2004 under our senior secured credit facility.  We have requested and expect to receive a waiver of the leverage ratio covenant from our [lenders], as well as amendments relating to the Company's proposed senior note offering.
>
> Since our adjusted EBITDA have more than doubled from the second quarter, we believe that our suppliers [sic]

8

continued cooperation and support will contribute to a strengthening of our balance sheet and our liquidity.

(Id. at ¶ 49 (alteration in original).)  Moreover, Exide filed a Form 10-Q with the SEC that same day, which reiterated its financial results for the third quarter of its fiscal year 2005. (Id. at ¶ 50.)

Exide issued a press release on May 16, 2005, announcing that it expected to violate the leverage ratio covenant and EBITDA covenant contained in its senior credit agreement.  (Id. at ¶ 51; Exide Br., at 3.)  Specifically, the May 16, 2005 press release provided:

> Exide . . . announced that it expects it will be in violation of its minimum consolidated EBITDA and leverage ratio financial covenants in its $365 million senior credit facility as of and for the fiscal year ended March 31, 2005.  The Company is working with the administrative agent for its senior credit facility to secure amendments to such covenants.
>
> [A]djusted EBITDA for the fiscal year ended March 31, 2005 will be in the range of $100-107 million [, which is below the required covenant amount].  The expected covenant issues primarily relate to the impact of commodity costs; the loss of overhead absorption due to an inventory-reduction initiative; other fourth-quarter inventory valuation adjustments; and costs associated with Sarbanes-Oxley compliance efforts.
>
> Revenue for the fourth quarter of fiscal 2005 was approximately $712.0 million compared with $676.0 million during the same quarter the previous year, with the increase primarily due to currency and lead-related pricing actions.

(Compl., at ¶ 51.)  Following the issuance of that press release, Exide's stock "fell by more than 38% in one day, from $11.15 per

share to $6.88 per share, with the pricing dropping as much as 48% during overnight trading from, $11.15 per share previously to the opening price of $5.75 per share on the morning of May 17, 2005." (Id. (emphasis omitted).)

The Individual Defendants conducted a conference call on May 17, 2005.  (Id. at ¶ 52.)  During the conference call, Gargaro explained that the EBITDA covenant required Exide to earn at least $122 million for the 2005 fiscal year, but the company expected its 2005 EBITDA to be between only $100 and $107 million.  (Exide Br., at 3-4.)  Further, Gargaro made a number of statements addressing Exide's current financial condition, including the following:

> The Company is working with the administrative agent for its senior credit facility to secure amendments to [the EBITDA and leverage ratio] covenants.  The Company expects to conduct meetings with the administrative agent and member institutions over the next three weeks.  While, of course, we cannot provide assurances that we will obtain these amendments we are hopeful that we will secure them in the next few weeks. . . .

> Several unanticipated or unusual items impacted our preliminary results during the quarter in the range of 15 to 20 million [dollars].  Those items include inventory write-offs of approximately 4.5 million related to obsolescence adjustments and physical inventories which were a result of the year-end process.  Of this amount, 2 million was the result of noncash obsolescence charges in Europe. . . .  We have initiated more clearly, defined procedures to ensure that we better manage these issues going forward to minimize the financial impact of these ongoing efforts. We also continue to refine our inventory cycle counting processes and other control enhancements as a means of earlier identification of inventory issues.

> The Company had forecast inventory reductions in the
> fourth quarter.  But clearly not to the levels we
> ultimately achieved.  In March alone we reduced
> consolidated inventories by over 30 million.  Compared
> with the same quarter last year the reduction was even
> more pronounced.  The result being a $6 million loss of
> absorbed overhead cost. . . .
>
> Finally, we have recorded <u>adjustments of approximately
> 1.5 [million] to $2 million</u> to reconcile pricing and
> commercial items in accordance with contractual
> provisions applying to a large customer in North
> America. . . . [W]e are disappointed in the weakness in
> our checks and balances, in this instance . . . .

(Compl., at ¶ 52 (emphasis, alterations, and omissions in

original); <u>see</u> Exide Br., at 4.)  Gargaro explained that certain

adverse business conditions had also negatively impacted Exide's

earnings, including (1) $4 million from unfavorable volume mix

and lower demand in certain markets, (2) $8 million from

unrecovered lead costs, (3) $5 million for purchase-price

variances related to certain commodities used in the

manufacturing process, and (4) $3 million from increased freight,

distribution and logistics costs.  (Exide Br., at 4-5.)

Following this conference call, Exide's stock fell to a closing

price of $5.33 per share on May 18, 2005, which constituted a 52%

drop from the closing price two days earlier.  (Compl., at ¶ 52.)

## III. Other Actions and Investigations Involving Exide

Two former Exide shareholders filed putative securities

class actions, which were later consolidated, against Exide,

Gargaro, Harvie, and Mulhauser on June 15, 2005.  (Exide Br., at

5.)  The former shareholders allege, <u>inter alia</u>, that (1) the

11

defendants intentionally or recklessly overstated Exide's inventories and net income by failing to account for obsolete and excess inventory, (2) Exide had ineffective internal controls, (3) despite the defendants' statements to the contrary, Exide's restructuring efforts were not succeeding, (4) the defendants were concealing Exide's need to write off between $1.4 and $2.8 million in connection with a government contract, and (5) it should have been "clear" to Exide's officers that it was going to violate its loan covenants. (Id. at 5-6.)

Exide, on June 27, 2005, filed a Form 8-K with the SEC, which noted that (1) Exide's next annual report would contain a "going concern" qualification from its independent auditor, and (2) the company had reviewed its internal controls and determined that there were two material weaknesses relating to the period-end financial reporting processes and the accounting for income taxes. (Compl., at ¶ 53.)  Thereafter, Exide filed another Form 8-K on July 8, 2005, which announced that the SEC had begun a preliminary inquiry into both Exide's management's prior statements that the company was expected to comply with its loan covenants in fiscal year 2005 and the independent auditor's "going concern" qualification. (Id. at ¶ 54.)  On the next full trading day, July 11, 2005, Exide's stock price fell 3.4% to a closing price of $4.82 per share.  (Id.)

12

Exide issued a press release on October 11, 2005 acknowledging that "[l]ast week, Murray Capital Management, Inc., a New York money manager, filed a suit in U.S. federal court over a March 2005 private placement in which Exide raised $350 million.  It alleges Exide misrepresented its financial condition at the time."  (Id. at ¶ 56; see Exide Br., at 6 (noting that Murray Capital Management commenced a putative securities action in the United States District Court for the Southern District of New York against Exide, Gargaro, Mulhauser, and Deutsche Bank Securities on October 3, 2005).)  Murray Capital Management asserts essentially the same allegations as the former shareholders assert in their consolidated action.  (Exide Br., at 6-7.)  The press release explained that Exide, Deutsche Bank Securities, and Mulhauser were all named as defendants in the action.  (Compl., at ¶ 56.)  Also, the press release stated that Exide intended to "vigorously pursue its defense".  (Id.)

**IV.  Changes to Exide's Board of Directors Between its Emergence from Bankruptcy and the Filing of the Complaint**

The following changes to Exide's board of directors occurred between May 5, 2004 and August 18, 2006: (1) McCarty, an outside director, resigned on May 2, 2005; (2) York, an outside director, was elected on April 19, 2005 but resigned on February 8, 2006; (3) Demetree, an outside director, was elected on March 16, 2005; (4) Davis, an outside director, resigned on August 30, 2005; and (5) David S. Ferguson ("Ferguson") and Carol R. Wetzel ("Wetzel")

were elected on August 30, 2005.  (Exide Br., at 8.)  Also, on
July 27, 2006, Exide issued a Notice of Annual Meeting of
Shareholders, which stated that Martineau and Demetree would not
stand for re-election at the annual meeting of shareholders
scheduled for August 22, 2006.  (Id. at 9.)  The notice announced
that Herbert Aspbury had been nominated for one of the empty
outside director positions.  (Id.)  Thus, it is likely that after
Exide's annual meeting on August 22, 2006, Exide's board would
have had at least three directors (Herbert Aspbury, Ferguson, and
Wetzel) who were not in any way associated with Exide during the
time it was allegedly mismanaged.  (Id.)[3]  Nevertheless,
Plaintiff commenced this action on August 18, 2006, two business
days before the August 22, 2006 annual meeting.  (See Compl.)

**DISCUSSION**

I.   **Legal Standards**

   A.   **Rule 12(b)(6)**

   A court may dismiss a complaint for "failure to state a
claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).
On a motion to dismiss, a court generally must accept as true all
of the factual allegations in the complaint, and must draw all
reasonable inferences in favor of the plaintiff.  Cal. Pub.

---

   [3] As of December 6, 2006, Exide's board of directors
consisted of four of the Individual Defendants (Ressner,
D'Appolonia, Ulsh, and Reilly) and four directors that are not
defendants in this action.  (Individual Defs. Br., at 8.)

14

Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 134 (3d Cir. 2004); Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  However, a court need not credit bald assertions or legal conclusions alleged in the complaint.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  "Dismissal of claims [on a motion to dismiss] is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim upon which relief may be granted." Jakomas v. McFalls, 229 F.Supp.2d 412, 419 (W.D. Pa. 2002). Here, Plaintiff argues that "after applying the proper pleading standard to the barrage of particularized allegations in the Complaint, [she] has more than complied with the applicable pleading standard", and thus, the Individual Defendants' arguments in favor of dismissing her claims are meritless.  (Pl. Second Br., at 1-2.)

    The Court, when considering a motion to dismiss, may generally not "consider matters extraneous to the pleadings."  In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426. However, if the Court exercises discretion and permits a party to present matters outside the pleadings, the Court must (1) convert the motion to dismiss into one for summary judgment, and (2) allow the parties a reasonable opportunity to present all material pertinent to such a motion under Rule 56.  See

15

Fed.R.Civ.P 12(b).  An exception to this general rule is that the Court may consider (1) exhibits attached to the complaint, (2) matters of public record, and (3) all documents that are integral to or explicitly relied upon in the complaint without converting the motion to dismiss into one for summary judgment.  Angstadt v. Midd-West Sch. Dis., 377 F.3d 338, 342 (3d Cir. 2004).

**B.   Legal Standards Governing Shareholder Derivative Actions**

Plaintiff is one of 3,500 Exide shareholders.  (Exide Br., at 9.)  Before commencing this action, Plaintiff did not make a demand on Exide's board of directors to commence an action asserting the claims set forth in the complaint.  (Id. at 10.) Exide contends that Plaintiff "also did not wait the two additional days that would have been necessary to permit Exide's annual meeting to go forward and its new slate of directors to be elected, despite having waited over a year after Exide's May 2005 announcements to file her Complaint."  (Id.)  The parties agree that because Exide is a Delaware Corporation, Delaware law governs the substantive aspects of Plaintiff's claims.  (Id. at 11; Individual Defs. Br., at 1; Pl. First Br., at 7; see Pl. Second Br. (citing Delaware case law in support of Plaintiff's claims).)  See Fagin v. Gilmartin, 432 F.3d 276, 282 (3d Cir. 2005) (noting that New Jersey's choice of law rules dictate that the law of the state of incorporation governs internal corporate affairs).

"The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  A shareholder bringing a derivative action on behalf of a corporation must make demand on the board of directors of such corporation unless doing so would be futile.  Fagin, 432 F.3d at 280; see Beam v. Stewart, 845 A.2d 1040, 1048 (Del. 2004) (explaining that a shareholder may only prosecute a derivative suit if such shareholder has demanded that the directors of the corporation bring the suit and they have wrongfully refused to do so or demand is excused because they are incapable of making an impartial decision regarding the proposed litigation); Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993) (same).  Rule 23.1 sets forth certain pleading requirements that a plaintiff in a shareholder derivative action must satisfy.  Rule 23.1 provides, in relevant part:

> [i]n a derivative action brought by one or more shareholders or members to enforce a right of a corporation . . ., the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the

17

> action the plaintiff desires from the directors or
> comparable authority and, if necessary, from the
> shareholders or members, and the reasons for the
> plaintiff's failure to obtain the action or for not
> making the effort.

Fed.R.Civ.P. 23.1.  While Rule 23.1 establishes the threshold

pleading requirements for a shareholder derivative action, the

substantive requirements of a shareholder's demand on the

corporation's board are governed by state law.  In re Merck &

Co., Inc., MDL No. 1658, Nos. 05-1151 & 05-2368, 2006 U.S. Dist.

LEXIS 27861, at *23 (D.N.J. May 5, 2006); see Kanter v. Barella,

489 F.3d 170, 176 (3d Cir. 2007) (explaining that the demand

doctrine is a matter of substance not procedure, and thus, state

law governs).

It is presumed that in making a business decision, the

directors of a corporation were informed, acted in good faith,

and believed that they were acting in the best interests of the

corporation.  Aronson, 473 A.2d at 812.  The burden is on the

party challenging the board of directors' decision to establish

facts rebutting this presumption.  Id.; see Beam, 845 A.2d at

1048-49; Rales, 634 A.2d at 933 (stating that the plaintiff in a

shareholder derivative action must overcome the powerful

presumptions of the business judgment rule).  Accordingly, in

determining whether it would have been futile for a shareholder

to make demand on a corporation's board of directors, the Court

must decide if, under the particularized facts alleged, a

18

reasonable doubt is created that (1) the directors are disinterested and independent, and (2) the challenged transaction was the product of a valid exercise of business judgment. Aronson, 473 A.2d at 814.

> As to the latter inquiry the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board.  Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint.  As to the former inquiry, . . . the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board. Certainly, if this is an "interested" director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases.

Id. at 814-15.

## 1.    Disinterested and Independent

An "interested" director has divided loyalties and "has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." Rales, 634 A.2d at 933 (emphasis omitted) (quoting Pogostin v. Rice, 480 A.2d 619, 624 (Del. 1984)); see In re Merck & Co., Inc., 2006 U.S. Dist. LEXIS 27861, at *36, *38-*39; Beam, 845 A.2d at 1049 (stating that a plaintiff can show that a director is interested by demonstrating that the decision could cause a personal benefit or detriment to the director). Directorial interest also exists where a decision of the board may detrimentally and materially impact a particular director,

19

but not the corporation or its shareholders.  Rales, 634 A.2d at
936.  Moreover, a director is only "independent" if his or her
decisions are based on "the corporate merits of the subject
before the board rather than extraneous considerations or
influences."  Id.; see Beam, 845 A.2d at 1050 (noting that
"independence" is a fact-specific determination requiring the
Court to consider "independent from whom and independent for what
purpose?").

It is insufficient for a plaintiff in a shareholder
derivative action to challenge a director's independence and
disinterest by simply alleging that such director may be
personally liable for approving the transaction at issue.
Aronson, 473 A.2d at 815, 817.  Allegations that a director
approved, participated, or acquiesced in the challenged
transaction, or that a particular director was also an executive
of the corporation at the time the decision at issue was made are
insufficient, without more, to establish that such director was
interested.  Fagin, 432 F.3d at 283.  Further, "proof of majority
ownership of a company does not strip directors of the
presumptions of independence, and that their acts have been taken
in good faith and in the best interests of the corporation."
Aronson, 473 A.2d at 815.

"Allegations of mere personal friendship or a mere outside
business relationship, standing alone, are [also] insufficient to

20

raise a reasonable doubt about a director's independence." <u>Beam</u>, 845 A.2d at 1050; <u>see</u> <u>In re Merck & Co., Inc.</u>, 2006 U.S. Dist. LEXIS 27861, at *57-*58.  Characterizations that certain directors are close friends or "move in the same business and social circles" must be accompanied by more serious allegations that create a reasonable doubt that the director is not independent, such as allegations showing that the "non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." <u>Beam</u>, 845 A.2d at 1051-52.  Thus, a shareholder derivative plaintiff can show that a director lacked independence by establishing that such director was "beholden" to interested directors "or so under their influence that their discretion would be sterilized". <u>Rales</u>, 634 A.2d at 936; <u>Aronson</u>, 473 A.2d at 815 (stating that the plaintiff must show "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person").

### 2.   A Valid Exercise of Business Judgment

The second inquiry in determining demand futility focuses on the business judgment rule and the board of director's approval of the substantive nature of the challenged transaction.  <u>Rales</u>, 634 A.2d at 933 (quoting <u>Pogostin</u>, 480 A.2d at 624).  This inquiry allows the Court "to address concerns regarding the inherent 'structural bias' of corporate boards asked, in essence,

to sue themselves." In re Merck & Co., Inc., 2006 U.S. Dist.
LEXIS 27861, at *32.  It allows a shareholder plaintiff to bring
a derivative action if there is a sufficiently substantial threat
of liability to the directors asked to act on the demand, which
casts a reasonable doubt over the impartiality of such directors.
Id.  However, "[w]here there is no conscious decision by
directors to act or refrain from acting, the business judgment
rule has no application", and thus, the Court need not consider
whether the directors acted in conformity with the business
judgment rule in determining whether demand would have been
futile.  Rales, 634 A.2d at 933 (noting that a court should not
apply the Aronson test for demand futility if the board that
would be considering the demand did not make any business
decision that would be challenged in the derivative suit).  Thus,
if the shareholder's complaint focuses on alleged inaction by the
board of directors, demand futility is demonstrated simply by
showing that a majority of the board is not independent or
disinterested.  In re Merck & Co., Inc., 2006 U.S. Dist. LEXIS
27861, at *33.

## II.  **Legal Standards Applied Here**

Plaintiff concedes that she did not make demand on the Exide
board before commencing this action.  (Compl., at ¶ 77.)  She
argues that her failure to make such a pre-suit demand is excused
"because such a demand would be a futile, wasteful and useless

act". (Id.)  Further, she asserts that she was excused from making demand because the Individual Defendants that served on Exide's board faced a sufficiently substantial threat of personal liability to compromise their ability to act impartially with respect to any such demand. (Pl. First Br., at 9.)

On the date the complaint was filed, Exide's board consisted of D'Appolonia, Demetree, Martineau, Reilly, Ressner, and Ulsh (collectively, the "Director Defendants"), as well as Wetzel and Ferguson, who are not defendants in this action. (Compl., at ¶ 77.)[4]  Thus, Plaintiff must raise a reasonable doubt that either a majority of these eight directors were not disinterested and independent, or the transactions at issue were not the result of this board's valid exercise of business judgment. See Aronson, 473 A.2d at 814.  This Court disagrees with Plaintiff's contentions and finds that the complaint does not set forth particularized facts raising such reasonable doubts, and thus, Plaintiff cannot pursue her derivative claim.

**A.  The Director Defendants' Alleged Disregard for Obvious "Red Flags"**

Plaintiff initially argues that "[t]he Individual Defendants consciously disregarded red flags indicating serious problems

---

[4] Gargaro, Harvie, and Mulhauser were not directors of Exide. (Id. at ¶¶ 17-19.)  Also, on the date the complaint was filed (1) Gargaro, Harvie, and Mulhauser no longer held officer positions at Exide, and (2) York, Davis, and McCarty were no longer Exide directors. (Id. at ¶¶ 17-19, 25-27.)

with the Company", and thus, there is a reasonable doubt that the
Director Defendants are disinterested "because each faces a
sufficiently substantial likelihood that they have breached their
duties of due care and good faith, which they owed to Exide and
its shareholders". (Compl., at ¶¶ 78-79.)[5]  Similarly, Plaintiff
argues that each of the Director Defendants face liability for
the actions they took as board members, including failing to
prevent both improper financial reports and the dissemination of
false information to the public. (Id. at ¶ 92 (stating that the
board's conduct subjected Exide to millions of dollars in
liability for possible securities fraud violations); see ¶ 87
(arguing that the Director Defendants authorized or permitted
Exide to disseminate false information to the public and
securities analysts).)  Because this allegation does not pertain
to any conscious decision by Exide's board to act or refrain from
acting, the Court need not consider whether the directors acted
in conformity with the business judgment rule in determining
whether demand would have been futile.  See Rales, 634 A.2d at
933 (noting that a court should not apply Aronson if the board
did not make any business decision that would be challenged in
the derivative suit).  Thus, because Plaintiff is claiming that

---

[5] Plaintiff does not assert that either Ferguson or Wetzel
were either interested or lacked independence on the date the
complaint was filed. (See Compl. (failing to name directors
Ferguson and Wetzel as defendants).)

Exide's board failed to act despite obvious "red flags", in order to show demand futility she must demonstrate that a majority of the board, on the date the complaint was filed, was not disinterested or independent. See In re Merck & Co., Inc., 2006 U.S. Dist. LEXIS 27861, at *33.

Plaintiff contends that the Director Defendants face a sufficiently substantial threat of liability because they were aware of Exide's internal controls problems concerning its most important product, batteries, and had a duty to investigate these problems rather than consciously ignoring obvious "red flags". (Pl. First Br., at 11-13.)  Plaintiff further contends that the Director Defendants (1) were aware and consciously disregarded that Exide's internal controls were critically deficient, (2) "idly sat by as Exide repeatedly issued misleading financial statements and piled up excess inventory", and (3) face a substantial likelihood of liability for breaching their fiduciary duties by failing to act to correct Exide's misrepresentations set forth in the complaint. (Id. at 13-14.)  According to Plaintiff, these allegations raise a reasonable doubt that the Director Defendants were disinterested and independent. (See id. at 11-14.)

Plaintiff cannot, however, challenge the Director Defendants' independence and disinterest by simply alleging that they would have been personally liable if they agreed to bring

25

the claims asserted in this derivative action. <u>See</u> <u>Aronson</u>, 473
A.2d  at 815, 817; <u>see also</u> <u>Fagin</u>, 432 F.3d at 283 (noting that
the "mere threat of personal liability" is insufficient to show
that the director is not independent or disinterested).  Instead,
Plaintiff must show that the Director Defendants face a
substantial likelihood of personal liability, which would prevent
them from acting impartially. <u>See</u> <u>In re Merck & Co., Inc.</u>, 2006
U.S. Dist. LEXIS 27861, at *36.  Plaintiff cannot establish such
substantial likelihood of liability by alleging the existence of
an "insured versus insured" provision in Exide's directors and
officers liability insurance policy, which would exclude from
coverage any action brought by Exide against its directors. <u>Id.</u>
at *42-*43.  (Compl., at ¶ 93 (arguing that demand would have
been futile because if the Individual Defendants brought an
action on behalf of Exide and against themselves or Exide
officers an "insured versus insured" exclusion would have
prevented them from having any insurance coverage with respect to
such action).)

    This Court, in <u>In re Merck & Co., Inc.</u>, concluded that the
shareholder derivative plaintiffs' conclusory allegations were
"insufficient to demonstrate that [the] [d]efendants'
participation in the alleged wrongdoing create[d] a risk of
personal liability that excuse[d] demand."  2006 U.S. Dist. LEXIS
27861, at *48.  There, the plaintiffs, shareholders of Merck &

Co., Inc. ("Merck"), alleged, <u>inter</u> <u>alia</u>, that certain Merck directors (1) breached their fiduciary duties by authorizing, approving, or consciously failing to prevent Merck from making false statements regarding its Vioxx product, and (2) approved and monitored strategic marketing plans and funding authorizations designed to promote Vioxx despite evidence and scientific data indicating that it has cardiovascular risks.  <u>Id.</u> at *48-*49.  In addressing these allegations, the Court noted that the plaintiffs' allegations that the director defendants possessed information regarding Vioxx's potential health risks did not alone establish that such directors would be incapable of considering a demand.  <u>Id.</u> at *49.  The Court also noted that the plaintiffs did not state how or in what way the director defendants participated in Merck's strategic decisions regarding Vioxx.  <u>Id.</u> at *50.

The Court acknowledged the plaintiffs' allegation that "Merck executives" were aware of a published study and journal article about the risks of Vioxx and had even met with the Food and Drug Administration to discuss the study results, but, nevertheless, it stated that the plaintiffs had not plead with particularity any knowledge or action by a particular Merck director or the board as a whole.  <u>Id.</u> at *51.  Further, the Court stated that the complaint "does not single out, among current or past directors, which directors participated in the

alleged wrongdoing . . . no individual directors or group of directors are set apart; in fact, many allegations do not differentiate among the directors and the other defendants." Id. (omissions in original).  Thus, the Court determined that the "plaintiffs' allegations of knowledge and participation on the part of the [Merck] Board [did] not create an inference that these directors face[d] a substantial likelihood of liability." Id. at *51.  The Court then explained stated that a substantial likelihood of liability can only be shown "in rare cases" where conduct is "so egregious on its face that board approval cannot meet the test of business judgment." Id. at *52.  The Court concluded that the plaintiffs' conclusory allegations that the director defendants disregarded known risks associated with use of Vioxx did not establish such egregious behavior. Id.

Plaintiff here similarly makes conclusory allegations that the Director Defendants disregarded information pertaining to (1) Exide's inability to meet its sales forecasts, (2) flaws in Exide's sales forecasts, (3) internal control problems, (4) excess and obsolete inventory, and (5) problems with Exide's key product, batteries.  (Compl., at ¶ 78.)  However, such allegations do not alone establish that the Director Defendants would have been incapable of considering a demand. See In re Merck & Co., Inc., 2006 U.S. Dist. LEXIS 27861 at *49.

28

Plaintiff has not asserted particularized facts suggesting (1) what each Director Defendant actually knew with respect to Exide's sales forecasts, internal controls, and excess inventory, or (2) how the Individual Defendants were reckless or negligent for failing to act in the face of these "red flags".  See id. at *51.  Moreover, like the Merck complaint, the complaint here does not expressly single out the directors that participated in the alleged wrongdoing or differentiate between the Director Defendants and the other Individual Defendants, Exide officers and former Exide directors, in setting forth the various claims.  See id.  Accordingly, under the reasoning of Merck, Plaintiff's allegations that the Director Defendants knew and participated in Exide's failure to address its inability to meet sales forecasts, internal controls problems, and excess inventory do not create an inference that the Director Defendants face a substantial likelihood of liability.  See id.  "Excusing demand on this basis [would] require[] Plaintiff to set forth particularized allegations sufficient to overcome the strong presumption that directors act in good faith, on an informed basis, and in the belief that they are serving the best interests of the corporation", but Plaintiff has not set forth facts sufficient to overcome this presumption.  Id. at *51-*52 (finding that the plaintiff's allegations did not make the requisite showing of egregious behavior).  Therefore, we find that Plaintiff has not

set forth particularized facts raising a reasonable doubt that
any of the Director Defendants were disinterested or could not
have impartially considered the demand.

We also note that Plaintiff has failed to allege
particularized facts indicating that either the Exide board is
dominated by a particular director, who was the proponent of the
challenged conduct, or extraneous considerations or influences
would have rendered any of the Director Defendants unable to
consider the corporate merits of the demand. Blasband v. Rales,
971 F.2d 1034, 1048 (3d Cir. 1992) ("When lack of independence is
charged, a plaintiff must show that the Board is either dominated
by an officer or director who is the proponent of the challenged
transaction or that the Board is so under his influence that its
discretion is 'sterilized.'"); see Rales, 634 A.2d at 936; Beam,
845 A.2d at 1050. Therefore, the Court will not permit Plaintiff
to "bootstrap allegations of futility merely by pleading that the
directors participated in the challenged [conduct] or that they
would be reluctant to sue themselves." Blasband, 971 F.2d at
1049.

**B.    The Audit Committee Members and CEO**

Ressner, D'Appolonia, and Martineau were members of Exide's
audit committee at times relevant to the complaint. (Compl., at
¶ 80.) The audit committee's duties include (1) reviewing and
discussing earnings press releases and other financial

information before it is disseminated to the public, and (2)
providing earnings guidance to analysts and rating agencies.
(Id.)  Plaintiff asserts that the audit committee "caused or
allowed directors to: (i) improperly hedge against the increase
in the price of lead and other commodities; (ii) announce
financial adjustments of $1.5 to $2 million due to a violation in
the terms of a contract with a large customer; and (iii)
improperly disseminate false information to the public regarding
the Company's inability to satisfy covenants related to a $365
million senior secured credit facility."  (Id.)  Accordingly,
Plaintiff argues that reasonable doubt exists regarding whether
Ressner, D'Appolonia, and Martineau are sufficiently
disinterested because they face liability for abdicating their
responsibilities as audit committee members.  (Pl. First Br., at
17.)

     Plaintiff similarly asserts that Ulsh, as Exide's CEO, was
the "conduit for communication" between both Exide and the public
and the board of directors and Exide's management.  (Compl., at ¶
81.)  She argues that reasonable doubt exists regarding whether
Ulsh is sufficiently independent and disinterested because, inter
alia, he (1) had a duty as Exide CEO to ensure that accurate
financial information was disseminated to the public, and thus,
would be liable for any false information that was released, and
(2) has an interest in continuing his employment with Exide and

continuing to receive substantial monetary compensation and benefits from the company.  (Pl. First Br., at 15-16.)  Thus, Plaintiff argues that Ulsh faces a substantial likelihood that he breached his duties of due care and good faith by causing or allowing shareholders to receive false or misleading information. (Compl., at ¶ 81.)

Plaintiff has failed to identify any particular personal acts by Ulsh, Ressner, D'Appolonia, and Martineau that sustain her contention that demand would have been futile.  See Fagin v. Gilmartin, No. 03-2631, 2004 U.S. Dist. LEXIS 28916, at *20-*21 (D.N.J. Aug. 20, 2004), aff'd in part and remanded in part Fagin, 432 F.3d 276 (denying the plaintiff's assertion that demand was futile because the complaint failed to allege any particularized facts demonstrating that a majority of the directors participated in the alleged wrongful conduct).  Alleging that these individuals  approved, participated, or acquiesced in the challenged conduct, is insufficient, without more, to establish that they were interested.  See Fagin, 432 F.3d at 283. Similarly, Plaintiff cannot establish that Ulsh was interested simply because he was an Exide executive at the time the conduct at issue occurred.  See id.

Listing the responsibilities of Exide's CEO and its audit committee members does not raise a reasonable doubt as to whether these persons were aware that Exide was disseminating false or

32

misleading information.  <u>Fagin</u>, 2004 U.S. Dist. LEXIS 28916, at
*22 (noting that the complaint described the duties and
obligations of the audit committee defendants, and finding that
the complaint was "devoid of any particularized facts"
challenging the presumption that the board acted with
independence and disinterest).  Thus, the Court finds that
Plaintiff has not asserted particularized facts that overcome the
presumption that either Ulsh, Ressner, D'Appolinia, or Martineau
acted with independence and disinterest.  The Court also finds,
with respect to the business judgment prong of the demand
futility analysis, that Plaintiff's general allegations
concerning the responsibilities of the audit committee members
and Exide's CEO do not demonstrate a substantial threat of
liability that would cast doubt over their impartiality.  <u>See In
re Merck & Co., Inc.</u>, 2006 U.S. Dist. LEXIS 27861, at *32.
Accordingly, because Plaintiff has not set forth what information
either Ulsh or the audit committee members knew and considered
and how they participated in the dissemination of false financial
information, Plaintiff has not shown that the conduct of any of
these individual was not the product of a valid exercise of
business judgment.  <u>See</u> <u>Aronson</u>, 473 A.2d at 814.

    **C.**    **The Influence of the Compensation Committee**

    D'Appolonia, Demetree, and Reilly were members of Exide's
compensation committee at times relevant to the complaint.

33

(Compl., at ¶ 82.)  The compensation committee's duties include (1) overseeing the administration of Exide's incentive compensation and equity-based compensation plans, (2) recommending to the board compensation for Exide's executive officers, (3) overseeing the administration of Exide's executive benefit plans, and (4) recommending to the board compensation arrangements for each director.  (Id.)  Plaintiff asserts that "[a]s the members of the Compensation Committee singularly control the other defendants' compensation awards, the remaining members of the Board will not institute this action against defendants D'Appolonia, Demetree and Reilly, in spite of breaches of duty by a majority of Compensation Committee members."  (Id. (emphasis in original).)  Plaintiff contends that the compensation committee has particular influence over Ulsh, whose full-time occupation is President and CEO of Exide.  (Id.)  Thus, Plaintiff asserts that demand on Wetzel, Ulsh, Martineau, and Ressner would have been futile because they "are under a financial influence which sterilizes their discretion".  (Id.) Accordingly, Plaintiff essentially alleges that these Individual Defendants lack independence.

Plaintiff has not alleged any particularized facts creating a reasonable inference that any of the Individual Defendants are so influenced by the compensation committee members that they could not consider the corporate merits of Plaintiff's demand.

34

Under Delaware law, a shareholder plaintiff cannot show demand futility by alleging that certain directors lack independence because they receive compensation for serving on the board.  <u>A.R. Demarco Enter., Inc. v. Ocean Spray Cranberries, Inc.</u>, CA No. 19133, 2002 Del. Ch. LEXIS 135, at *17 (Del. Ch. Nov. 26, 2002) (noting that it is "well established under Delaware law that ordinary director compensation alone is not enough to show demand futility"); <u>see</u> <u>Grobow v. Perot</u>, 539 A.2d 180, 188 (Del. 1988) (stating that averring that a company's directors are paid for their services does not establish financial interest sufficient to satisfy the first prong of the <u>Aronson</u> test), <u>overruled on other grounds by</u> <u>Brehm</u>, 746 A.2d 244.  Therefore, this Court finds that Plaintiff has not set forth facts sufficiently suggesting that any of the Individual Defendants were beholden to the members of the compensation committee.  <u>See</u> <u>Rales</u>, 634 A.2d at 936 (stating that a shareholder derivative plaintiff can show that a director lacked independence by establishing that such director was "beholden" to interested directors "or so under their influence that their discretion would be sterilized").

     **D.   The Plaintiff's Remaining Demand Futility Allegations**

Plaintiff, in addition to making the above demand futility arguments, makes a number of additional conclusory allegations that do not raise a reasonable inference that the majority of the directors were interested, lacked independence, or would not

35

exercise sound business judgment.  For example, Plaintiff asserts
that demand would have been futile because (1) the Individual
Defendants caused Exide to file an 8-K stating that Exide intends
to "vigorously pursue its defense" to the securities class action
containing similar facts to this action, (2) "[i]n order to bring
this suit, all of the directors of Exide would be forced to sue
themselves and persons with whom they have extensive business and
personal entanglements", (3) the Individual Defendants are
"hopelessly conflicted" because the claims asserted in this
action would likely expose them to further violations of
securities laws and cause additional civil actions to be
commenced against them, (4) Exide has incurred significant losses
but the Individual Defendants have not commenced any actions to
remedy those losses despite having knowledge of the claims
Plaintiff raises herein, and (5) Wetzel and Ferguson will not
bring an action against their fellow board members.  (Compl., at
¶¶ 83, 85, 88-89, 91, 94.)  Nevertheless, the Court does not
believe that any of these allegations substantiate Plaintiff's
demand futility claim.

    The securities class action currently pending in this Court
against Exide and certain of its officers involves entirely
different claims than those asserted here.  (See Civ. Action No.
05-3098, dkt. entry no. 1, Compl.)  Thus, Exide's statement that
it intends to vigorously pursue its defenses in that action has

no relevance to Plaintiff's demand futility claims in this action, which is brought on behalf of Exide and against certain of its directors and officers.  Moreover, Plaintiff cannot establish demand futility by noting that Exide board's failed, on its own initiative, to commence any actions against current or former board members or executives despite knowing that Exide incurred significant losses due to problems with its internal controls and obsolete inventory.  See Blasband, 971 F.2d at 1052 (explaining that "a board's failure to take action, even if it is aware of wrongdoing, does not demonstrate futility").  Similarly, "[p]otential liability from other, unrelated litigation would not make . . . directors interested in the decision to consider a demand for this specific derivative suit." Fagin, 432 F.3d at 283-84.  Therefore, Plaintiff cannot show demand futility simply by alleging that the Individual Defendants may have faced future civil actions if they permitted the claims asserted in this action to go forward.

Plaintiff also cannot substantiate her demand futility claim simply by alleging that she would be asking the Individual Defendants, as well as Wetzel and Ferguson, to bring an action against their friends, business associates, and fellow board members.  As noted above, allegations regarding personal friendships or outside business relationships are insufficient to raise a reasonable doubt about a director's independence.  See

37

<u>Beam</u>, 845 A.2d at 1050; <u>In re Merck & Co., Inc.</u>, 2006 U.S. Dist.
LEXIS 27861, at *57-*58.  Such allegations must be accompanied by
more serious allegations showing that the "non-interested
director would be more willing to risk his or her reputation than
risk the relationship with the interested director", but
Plaintiff has not made any such additional allegations.  <u>See</u> <u>Beam</u>
845 A.2d at 1051-52.  In fact, Plaintiff has not made any
specific allegations concerning the personal or business
relationships between any of Exide's current and former directors
or how such relationships might affect any board member's ability
to act independently with respect to this action.  <u>See</u> <u>In re
Merck & Co., Inc.</u>, 2006 U.S. Dist. LEXIS 27861, at *58.  Her
blanket assertion that "all of the directors of Exide would be
forced to sue themselves and persons with whom they have
extensive business and personal entanglements", is not sufficient
to excuse demand.  Also, we have already determined that
Plaintiff's allegation that the Individual Directors would be
required to "sue themselves" does not warrant excusing demand.
<u>See</u> <u>Blasband</u>, 971 F.2d at 1049; <u>see also</u> <u>Kanter</u>, 489 F.3d at 177
(discussing New Jersey court case that rejected the suggestion
that demand would be futile because directors would have to sue
themselves).

    This Court finds, in light of the above, that Plaintiff's
allegations concerning demand futility, whether viewed separately

or as whole, do not create a reasonable doubt that on the date
the complaint was filed a majority of Exide's directors were
either interested or lacked independence.  Moreover, Plaintiff
has not set forth particularized facts, as required by Rule 23.1,
demonstrating any reason that Exide's board could not have
exercised independent business judgment when considering
Plaintiff's demand.  Therefore, we conclude that demand would not
have been futile here.

**CONCLUSION**

The Court, for the reasons stated <u>supra</u>, will (1) grant the
Individual Defendants' motion to dismiss, (2) grant Exide's
motion to dismiss, and (3) dismiss the complaint pursuant to Rule
12(b)(6).  The Court will issue an appropriate order and
judgment.[6]


      s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

_____

[6] The Court notes that the "demand requirement would be
rendered meaningless if a plaintiff who cannot establish demand
futility when he files suit is nonetheless permitted to amend his
pleading using materials later obtained during discovery to
justify his failure to make a pre-suit demand."  <u>In re Merck &
Co., Inc.</u>, 2006 U.S. Dist. LEXIS 27861, at *64.  Accordingly,
Plaintiff will not be given an opportunity to amend the complaint
because it appears that she has already set forth all facts
available to her in support of her demand futility claim.  Thus,
dismissal here is with prejudice.